## INHABITANTS OF ARGYLE *versus* RUFUS DWINEL.

By the provisions of Rev. Stat. c. 121, § 33, 37, the proceedings and judgment on a petition for partition are not conclusive, unless against one who appeared and answered to the petition, upon an elder and better title than that of the person holding by virtue of the partition.

When a person is the owner of an undivided portion of lands holden in common, which portion is severed and set out, to be holden in severalty by legal process and proceedings for partition, his title adheres to and follows the estate, and becomes limited by it.

The fact, that the lands in a town reserved for public uses had been sold and conveyed, could not prevent their legal location.

When a creditor attaches the estate of his debtor held in common with others, that cannot prevent the other part owners from procuring a legal partition of the estate. Nor will such partition vacate or destroy the attachment which will remain a lien on that part of it set off to the debtor.

And if the attachment be followed by a judgment, execution and levy, that levy cannot, if made after the partition, be legally made upon the debtor's interest, as a common and undivided estate. To be effectual to convey the title, it must be made upon the estate assigned to the debtor to be held in severalty.

If the treasurer of a town be authorized to convey the lands reserved for public uses on certain conditions, under the provisions of the statute, a conveyance thereof, made by him without the performance of the conditions, is unauthorized and void. As the power of the board of trustees to

authorize the conveyance, was conferred by statute, it could be legally exercised only in accordance with such statute provisions; and their acts, performed afterwards, which might otherwise amount to a ratification of the doings of the treasurer, would be inoperative.

The effect of the act incorporating a part of the plantation of Argyle into a town by the same name, was to sanction the location of the public or reserved lands within the plantation, and to assign to the town of Argyle the benefit of those lots which had been located within its corporate bounds.

WRIT OF ENTRY demanding one of the lots of land in Argyle located for public uses.

At the trial, before SHEPLEY J., after the parties respectively had read deeds, acts of the Legislature and other written or printed evidence, and introduced and examined their witnesses, they agreed that the case should be taken from the jury, and submitted to the decision of the Court, upon a report of the trial, with authority to draw inferences, and enter such judgment, by nonsuit or default, as the legal rights of the parties might require. No copy of any of the papers read at the trial, came into the hands of the Reporter.

The facts necessary to the understanding of the points decided will be found in the opinion of the Court.

*Cutting*, for the demandants.

Demandant's title : — Deed from Massachusetts to trustees, dated June 12, 1815, reserving four lots of 320 acres each, one for use of ministry; one for first settled minister; one for schools and one for the future disposition of the Legislature.

" An Act to provide for the location of certain lands," approved March 17, 1835, authorized organized plantations by their assessors to locate reserved lots.

Location by the assessors of the plantation, as per Common Pleas records, January Term, 1838; one of which lots plaintiffs demand in this suit, located in that part of the plantation of Argyle since incorporated into a town by the act of 19th March, 1839, in which is this provision : — " And the said town of Argyle shall retain one half of all the public or reserved lands called the ministerial and school lands, leaving the west part of said plantation an equal half of said lands, being so located and divided at the time aforesaid."

The location shows two lots in Argyle and two lots in the residue of the plantation. And the clause in the act, "being so located and divided at the time aforesaid," (date of the act,) gives to each territory the lots within its boundary to be held in severalty, otherwise that clause is without sense or meaning.

By statute of 1824, chap. 254, § 1, the fee in reserved lots became vested in the inhabitants of towns when incorporated.

Thus is traced from the Commonwealth of Massachusetts, a perfect title to the premises demanded.

Tenant's title: — Petition for partition of 960 acres in common and undivided in township No. 3, same as in Commonwealth's deed to trustees. Report accepted by this Court, June Term, 1847, setting off to petitioner the same lots which had previously been located by the assessors of the plantation, and embracing the demanded premises.

Tenant then relies on section 31, ch. 121, Rev. Stat. as a defence to demandant's suit. Is it so? Certainly not. See sections 33 and 34, same chapter.

The demandants claim to hold in severalty a part of the premises described in the partition, and have deduced their title from the Commonwealth, while the tenant has exhibited no title, but an *ex parte* proceeding of a very recent date.

Township No. 3, now comprises the towns of Argyle and Alton, and between 30 and 40 M. acres, 1000 inhabitants, and, at the time of partition, from 50 to 100 owners of separate and distinct lots, claiming a perfect title under the Commonwealth through the trustees. Now can it be contended that all of these proprietors must take notice at their peril and attend Court and see that their rights are not interfered with, or otherwise hazard their estates, without right of invoking the 33d section?

Any person so disposed may bring his petition for partition for 100 acres in common and undivided, in the city of Bangor. Must every inhabitant appear in Court at his peril? So that on comparison of titles, the Court are to judge which is the better.

Tenant's title prior to partition: — Writ, *Samuel G. Oaks* v.

*Cyrus Moore & al.* May 1, 1837. Attachment of all Moore's real estate, May 3, 1837. Judgment, April 30, 1845. Levy on 960 acres, in common and undivided in township No. 3, May 23, 1845. Deed from said Oaks to tenant, June 4, 1845.

Now the question arises, what was Moore's title at the time of the attachment, May 3, 1837.

It was a deed from Nathaniel Danforth, Jr. treasurer of the trustees of the ministerial and school funds in the plantation of Argyle of August 29, 1835 : — recorded, May 21, 1836 : — conveying three lots of 320 acres each in common and undivided with the other lands in said plantation, and being lots reserved for public uses.

1. Under this state of facts, the question arises, could said treasurer convey by deed the reserved lots, before they were located ? I contend that he could not.

The law pointed out only two ways by which the reserved lots could be located and separated from the rest of the lands in the township. The stat. of 1821, ch. 41, authorized the Court of Common Pleas, on application of the assessors to appoint three · disinterested freeholders to locate and designate said lots. Also authorized the proprietors of the grant in which public lots were reserved to locate the same and make return thereof to said Court for their acceptance, &c. These being the only modes authorized by law for location, how could Moore ever legally perfect a location ? After his purchase he could have no legal process to compel either the assessors or the proprietors to locate. And the law does not authorize a location on petition for partition.

So far from it, the stat. of 1839, ch. 357, sec. 1, re-enacted in Rev. Stat. ch. 121, sec. 40, expressly provides, that in any process for partition the public lots shall first be set off, before the commissioners shall proceed to make partition.

· It was the duty then of the commissioners first to have set off the public lots before proceeding to the partition, or in the language of the statute, "then proceed to execute the other duties assigned them by the Court," thereby clearly excluding the idea or conclusion that reserved lots are the subject matter of partition.

The statutes regulating partition of land and location of public lots are dissimilar and variant; a location cannot be made by process of partition. *State* v. *Inhabitants of Baring,* 8 Maine R. 135.

Therefore there can be no valid grant, when the grantee can have no power to avail himself of his grant: — if the law ever contemplated such a state of things, provision would have been made.

2. Moore's deed was void, because the treasurer, Danforth, did not comply, in making sale of the public lots, with the requirements of law.

As the conveyance was only authorized by statute of 1824, ch. 254, sec. 3, the grantee must show a strict compliance with all the requisitions of that statute. *Alvord* v. *Collins,* 20 Pick. 421, 424; *Stetson* v. *Kempton,* 13 Mass. R. 278; *Davis* v. *Maynard,* 9 *ib.* 247; *Wolcott* v. *Strout,* 19 Maine R. 132; *Means* v. *Osgood,* 7 *ib.* 147; *Howard* v. *Turner,* 6 *ib.* 108.

"An authority to an agent to sell and receive the money does not authorize him to sell without receiving the money." *Falls* v. *Gaither,* 9 Porter, (Ala.) 605.

That all acts of agents, public or private, exceeding authority, are void, is a well established proposition.

Now sect. 3 of the stat. of 1824, after conferring power to the trustees to convey the public lots, contains this language. "And the proceeds of such sale shall be, as soon as may be, put at interest by said trustees, and secured by mortgage of real estate to double the value of the amount at interest; or by bond or note with sufficient sureties, or invested in bank stock or public securities." Such language plainly contemplates a cash sale; otherwise, how could the proceeds be put at interest and secured to double the value of the amount?

Money, usually, is the only subject matter for investment in bank stock or public securities and not Moore's note payable in five years.

How could either Moore or the trustees suppose, that such a note could be invested according to the true intent and mean-

ing of that statute, which was cautiously drawn and designed to secure the funds derived from the sale.

Or if the trustees chose to accept and the purchaser to give his note as the consideration, he must at the time secure it by a mortgage of real estate to double the amount, or sufficient sureties. Such at least was the imperative duty of the trustees to require and the purchaser to perform, before he could invoke the aid of the statute, which gives an authority, but couples it with a duty.

The tax act says, " the collector shall proceed to sell so much of the said lands as shall be sufficient to discharge said taxes, &c. and shall give and execute a deed," &c. And this Court has decided that such language implies a cash sale, and that the purchaser's note, given instead of cash, invalidates his deed.

So in this case, the act says, " said trustees shall have power to sell and convey," &c. — in one case the proceeds are appropriated to the discharge of the tax, in the other in investment as prescribed.

Now let us examine the acts and negotiations of the parties, and see if there be a compliance with the requirements of law. And first, a vote to bond to Cony and Winslow, at a meeting on April 16, 1835.

A bond from certain persons purporting to be trustees to Cony and Winslow, dated April 14, 1835, to convey to them the public lots containing 960 acres in common with the other lands, at the rate of one dollar per acre, provided said obligees, within 60 days should give good and sufficient security for said payment in equal annual instalments of 1, 2, 3 and 4 years with interest.

An indorsement on the bond signed by three of said trustees, and a majority, as they say, dated June 13, 1835, acknowledged the receipt of said Cony and Winslow, and Isaac J. Stevens' note in performance of the bond; and authorized their treasurer to deed to Cony and Winslow, on request; and if said Cony and Winslow shall prefer and shall deliver to said treasurer, Cyrus Moore's note, with security for the above sum payable in same manner, said treasurer is authorized to give the deed to

said Moore ; and said Cony, Winslow and Stevens' note, to be canceled, having passed a vote, they say, to that effect. And, at a meeting of said trustees, held on said June 13, 1835, it was voted substantially as above, only instead of Moore's note with security, it is with surety.

Next appears the treasurer's deed to said Moore, dated August 29, 1835. Then said Moore's mortgage to the trustees, of the same land to him conveyed, dated July 1, 1836, to secure his note of that date for $960 payable in 5 years with interest annually ; and the note is in the case wholly unpaid and Moore insolvent. Mortgage recorded, Aug. 10, 1839. Now can any court say, that these proceedings, even under the most favorable aspect they can be presented by the tenant, can sustain Moore's title ?

Assume for argument's sake that the deed had been made to Cony and Winslow and that the bond or note mentioned in the statute, was equivalent to a cash payment, still Cony and Winslow, even then, would not have complied with the requirements of the law.

The statute demands " a bond or note with sufficient sureties." But the note furnished by Cony and Winslow had only one surety.

One surety is not a compliance when a statute requires sureties. *Simons* v. *Parker*, 1 Metc. 508.

But it is immaterial as to what might have been Cony and Winslow's title, had the deed been given to them and their note retained ; that transaction was vacated and their note canceled, and becomes no otherwise important than as a curious matter of history, exhibiting a little of the machinery.

Moore's title we are considering. Moore does not claim under Cony and Winslow, but under the trustees. On the 29th August, 1835, we find a deed executed to Moore, and recorded May 21, 1836, and Moore's note and mortgage, dated July 1, 1836, nearly one year subsequent to the date of the deed, and more than one month after it was recorded.

But from the proceedings of the new board, held on the 13th July, 1839, it would seem that Cony's note was surrendered,

and Moore's note and mortgage, substituted. And perhaps it may be said that the deed was given to Moore at the request of Cony and Winslow, the treasurer still holding Cony and Winslow's note as the consideration for the deed to Moore. Supposing such to be the state of facts, then Moore's deed would be void for two reasons.

*First.* Because Cony and Winslow's note was not such security as the statute requires, as I have before shown; and besides, the proceedings of the 13th July, 1839, do not speak of Cony and Winslow's note, but Cony's note.

*Second.* The treasurer, Danforth, did not comply with the vote of the 13th June, 1835, which was the only authority he had, for making his deed to Moore.

There is no pretence that Cyrus Moore's note, was procured at the date of the deed, nor until nearly a year afterwards; and then without surety and instead of being payable in four annual payments, in the manner of Cony and Winslow's, it was payable at the end of five years.

But, perhaps, it may be argued, that assuming that the treasurer had no authority to deed to Moore, and that said deed was void, still the proceedings of the 13th July, 1839, was a sanctioning of the treasurer's act, and that it became a valid deed from and after that time. Suppose it to be so; that the deed received vitality on the 13th July, 1839, and not before; then Oaks took nothing by his attachment, May 3, 1837, neither by his levy, May 23, 1845, for previous to that time, Moore's mortgage was recorded.

But, I contend, that the action of the boards on the 13th July, 1839, did not operate to sanction the prior proceedings; that their action was illegal and void. Because the case finds that the two boards of the town of Argyle and the plantation of Argyle, met together and acted in conjunction.

Now I contend that the two boards could not act and vote in conjunction; previous to that time, the lots had been located, the plantation divided, and the lots divided between the two corporations as " so located."

3. Thus far I have proceeded on the assumption, that the officers, composing the board of trustees, have been legally chosen and qualified to act.

But I now contend that such was not the fact, that they were not such *de jure*, that the statute never authorized officers *de facto* and not *de jure* to make sale of reserved public lots.

The same rule applies in this case as has been applied to the sale of land for the payment of taxes, the authority in both cases being derived solely from the statutes, and the law applicable to the one is equally applicable to the other. And in the trial of every tax title in this State and in Massachusetts, in no instance, I apprehend, has the legal proof of the election and qualification of town officers been dispensed with. Our Reports abound in cases as to this point. So in sales by executors, administrators and guardians under statute provisions, it is necessary to prove them such, *de jure*.

The meeting held March 16, 1835, for the choice of plantation officers, next previous to the sale, was invalid, because there was no legal notice to the inhabitants. Return on the warrant for calling the meeting was dated same 16th of March by Geo. H. McKecknie, stating " that he had posted up notices in four public places," but not stating for how long a time. This is no compliance with the usage which requires seven days' notice and a service by posting up copies, &c. *Perry* v. *Dover*, 12 Pick. 206 ; *Tuttle* v. *Cary*, 7 Maine R. 430.

At the first meeting of the board, April 11, 1845, Warren Burr was chosen President and Gideon J. Newton, Clerk, who was sworn by the President. President had no authority to administer oaths, no more than the president of a bank, college or any other corporation. The statute of 1824 requires that " the clerk of the board shall be sworn to the faithful performance of his duty."

It follows then that the board had no clerk, or recording officer, such as the law recognizes, and consequently the board have no records.

The oath of Gideon J. Newton, at the trial, that he made a true record of the proceedings, was unauthorized. It was an

attempt to substitute parol for record testimony. It was not a record made under the sanction of an oath, it was nothing more than minutes by which it may be said Newton might refresh his memory.

The act incorporating town of Argyle was approved March 19, 1839. Legislature adjourned March 25, 1839. Meeting to organize the town was held April 22, 1839, 28 days only after the final adjournment of Legislature. And the warrant introduced by defendant also shows that at this meeting the usual town officers were to be chosen and the records of the town show that they were chosen. The act of incorporation was a public act, and did not take effect until thirty days after the final adjournment, consequently the meeting for the organization and choice of officers was held two days before the existence of the law, therefore the meeting was a nullity. *Gorham* v. *Springfield*, 21 Maine R. 58.

We thus show that the trustees of the town of Argyle, who met on 13th July, 1839, and acted in conjunction with the trustees of the plantation, were not legally trustees, and that their act for this cause also is void, and consequently no recognition of the acts or doings of a former board can avail the tenant, even if a law violated, could be made valid by recognition.

And this leads me to the 4th point in the case, or Satan on the mountain, for this board of trustees undertake to give away what they did not possess.

The act of 1824, ch. 254, § 1, vested the fee of the reserved public lots in towns, when incorporated. Where was the fee vested before that act? I answer, in the Commonwealth. Lots reserved were not granted: — if granted what becomes of the lot for the future disposition of the Legislature for one was as much a grant as the others: — if granted, to whom granted? No person was *in esse* capable of receiving a grant, and our laws do not recognize a fee in abeyance. The fee then inevitably remained in the Commonwealth until the township became incorporated, when it vested in the inhabitants. The fee then being in the Commonwealth, and not transferred

and vested in the the town, until its incorporation, how could the board of trustees of the plantation of Argyle dispose of the reserved lots ? The statute of 1824 only gave the board of trustees in towns authority to sell. The board in the plantation of Argyle, it is contended, derived their right to sell by virtue of a private act entitled "an act to provide for the sale and distribution of the ministerial and school lands in the plantation of Argyle," passed March 20, 1835, which constitutes the assessors, clerk and treasurer of Argyle plantation a body corporate — "with all the powers granted to, and subject to perform all the duties required by law of trustees of incorporated towns for similar purposes."

This last mentioned act presents this anomaly, it seems to authorize the board to sell lands as one of the powers belonging to the trustees of a town, while the fee of the lands has never vested in the inhabitants of the plantation.

The language of the statute of 1824, authorizing a sale by trustees of a town, is this, "that said trustees shall have power to sell and convey all the ministerial and school lands belonging to their respective towns."

A true translation of the private act of 1835 would then be this — "that said trustees of said plantation shall have power to sell and convey all the ministerial and school lands belonging to their plantation." A very harmless act, for the plantation had no ministerial and school lands — as I have already shown that the fee had never vested in the plantation.

If it be contended that said act was designed to be otherwise than harmless, then I contend —

5th. That said act was unconstitutional and void for two reasons.

First. In the 7th condition in the act relating to the separation of Maine from Massachusetts and incorporated into our constitution, are these words, "all grants of lands, franchises, immunities, corporate or other rights, and all contracts for, or grants of land not yet located, which have been or may be made by the said Commonwealth, before the separation of said District shall take place, and having or to have effect within

the said District, shall continue in full force after the said District shall become a separate State."

Long before the passage of this statute this township had been granted to the institution, reserving the public lots which at its passage had not been located, or at the separation.

Now what right had the Legislature of Maine to authorize the assessors, &c. of the plantation to sell these unlocated public lots? In any point of view it was unauthorized and unconstitutional. See *Trustees of New Gloucester School Fund* v. *Wm. Bradbury*, 11 Maine R. 126.

Neither was this private act of 1835 authorized by any of the acts modifying the terms and conditions of the act of separation, and approved by the Legislature of Massachusetts.

The first of which is the act of 1831, Feb. 19, entitled " An act to modify the terms and conditions of the act of separation."

This act created no alteration in the law as it before was established, but was designed to give more power to the Legislature of this State, and to obtain the consent of Massachusetts.

Now has the aforesaid statute the least relation or reference to lands in plantations, when it speaks of towns only, and " the consent of such trustees and of the towns? It has relation wholly to lands in *towns*, where the inhabitants may give their consent or refusal. So the Legislature of Maine, in 1832, understood it, for having obtained the aforesaid consent they reenacted in substance the act of the prior year, by act of March 9th, 1832. It speaks of towns, selectmen, town clerk, and no where of plantations or assessors.

*A. W. Paine*, for the tenant, went into a full argument of the case. Some of the grounds on which he claimed a decision in his favor will be stated. He first gave his view of the manner in which the parties respectively derived the titles under which they claim ; and then a list of the acts in relation to the location and sale of the lands reserved for public uses.

The tenant shows a perfect title by the proceedings in partition, by which this lot was assigned to be holden in severalty. Rev. Stat. c. 121, § 31.

But not only has the tenant a perfect title, but the demandants have none. They must show title in themselves, or must fail in their action.

The proceedings of the town meeting, relied upon to authorize the sale, are valid and binding, although the return of the warrant does not show that the provisions of the law had been complied with. A general return is sufficient. 8 Greenl. 343; 3 Fairf. 487; 8 Pick. 112.

Danforth, the treasurer, had authority to make the conveyance to Moore. *Williston* v. *Morse*, 10 Metc. 17.

The vote did not require a sale for money, and there was a discretionary power given as to the security. The purchaser is not responsible for the proper use of the money. Even, had there been a restriction to a particular kind of security, if there was any loss by departing from the requirement, the agent might be compelled to make it good, but it could not render the sale invalid.

Besides, if there was any defect of authority originally, the acts of the agent were afterwards ratified by the plaintiffs. The vote of the town to foreclose the mortgage was a sufficient ratification. As the parties interested remained unchanged, the ratification related back to the time of the first act. 2 Metc. 163.

The opinion of the Court, SHEPLEY, TENNEY and WELLS Justices, sitting in the case, was drawn up by

SHEPLEY J. — The demandants claim to recover one of the lots located for public use in that township. The Commonwealth of Massachusetts, on June 12, 1815, conveyed township numbered three, including the present townships of Argyle and Alton, to the trustees of the literary and theological institution, reserving four lots of three hundred and twenty acres each, for public uses.

By the act approved on March 15, 1821, c. 41, the circuit Court of Common Pleas was authorized on application of the assessors of a town, in which such reservations had been made, and not located, to cause them to be located. By the act ap-

proved on March 17, 1835, c. 170, the assessors of organized plantations were authorized to obtain in like manner a location of the lots reserved within them for public uses.

The Court of Common Pleas on petition of the assessors of the plantation of Argyle, at its session in this county in the month of January, 1838, caused the lots reserved for public uses in that plantation to be located. Two of those lots were thus located within and two without the territory incorporated as the town of Argyle, by the act approved on March 19, 1839, the second section of which provided, that the town should "retain one half of all the public or reserved lands, called the ministerial and school lands, leaving to the west part of said plantation an equal half of said reserved lands, being so located and divided at the time aforesaid." The time alluded to was the time of the approval of that act. The effect of the act was to sanction the location, which had been made, and to assign to the town of Argyle the benefit of those lots, which had been thus located within its corporate bounds. The title of the demandants is thus presented.

The tenant claims the lot, first by a petition, proceedings and judgment in partition. He filed a petition, alleging that he was seized of nine hundred and sixty acres, in common and undivided with persons unknown, in township numbered three, describing it. Partition was ordered after due notice, commissioners were appointed, and the lot demanded was assigned to the tenant; and the final judgment establishing the partition was rendered at the session of this Court in this county in the month of June, 1847.

The effect of these proceedings upon the title to the lot must depend upon the provisions of the Revised Statute, c. 121. The provisions of the thirty-third section are, " if any person who has not appeared and answered to the petition for partition, shall claim to hold in severalty the premises described therein or any part thereof, he shall not be concluded by the judgment for partition, but may bring his action for the land claimed, against any or all of the petitioners or respondents, or of the persons holding under them, as the case may require,

within the same time, in which he might have brought it, if no such judgment for partition had been rendered." The provisions of the thirty-seventh section are, " if any person, to whom a share shall have been assigned or left, shall be evicted thereof by any person, who at the time of the partition had an elder and better title, than those, who were parties to the judgment, he shall be entitled to a new partition of the residue in like manner, as if no partition had been made." The language of these sections is too plain to leave the intention and construction doubtful, that the judgment should not be conclusive upon an elder and better title, than that of the person holding by virtue of the partition. The demandants have exhibited a title apparently elder and better, than the tenant can have, unless he can make a breach upon it. And this, it is contended in the second place, that he has done.

This branch of his title commences on April 16, 1835, by a vote passed by the trustees of the lands reserved for public uses in the plantation of Argyle, to convey them to Nathan Winslow and Samuel Cony upon certain terms. Those trustees executed a bond, bearing date on April 14, 1835, obliging themselves to convey them on the terms named, within sixty days, to Winslow and Cony.

On June 13, 1835, the trustees received a note signed by Winslow and Cony and Isaac G. Stevens for $960, bearing date on May 11, 1835, and payable with interest from the fourteenth day of April, preceding. And at their meeting on the same thirteenth day of June, they passed a vote authorizing their treasurer to convey the lands to Winslow and Cony as bonded; and also a vote authorizing him " if Cony and Winslow should bring and deliver to him Cyrus Moore's note, with surety for said sum, payable in said manner, to deed to Moore instead of to Winslow and Cony and to give up then their note and receive Moore's instead."

It appears, that Nathaniel Danforth, Jr. then treasurer, made a conveyance of the lands to Cyrus Moore on August 29, 1835, which was recorded May 21, 1836, without receiving any note signed by Moore with surety, and without surrendering the

note signed by Winslow and Cony with Stevens. That Cyrus Moore made a note payable to the treasurer without surety for the same amount, and on July 1, 1836, made a mortgage of the same lands to the treasurer, to secure the payment of it; and that these were left in the possession of Samuel Cony.

There is no proof of any further proceedings, until after the town of Argyle was incorporated by an act approved on March 19, 1839.

On July 13, 1839, the town officers of Argyle, designated by law as trustees of the public lands, and the like officers of the plantation of Argyle composed of the remainder of the township, met together and voted, that their committee be instructed to surrender Samuel Cony's note, and receive Cyrus Moore's note and a mortgage, which are lodged in the hands of Samuel Cony, provided they are satisfied, that there is no attachment which will interfere with the security of that mortgage, and if they receive the mortgage to have it put on record immediately. At a meeting of the trustees after the mortgage had been received, they voted to foreclose the same. And at another meeting, held about one year afterward, they passed a similar vote. These proceedings exhibit the title of Moore.

The tenant derives his title from Moore, by an attachment of all Moore's estate in this county, made on May 3, 1837, by virtue of a writ against him and in favor of Samuel G. Oakes. Judgment was recovered in that suit on April 30, 1845, and an execution, issued thereon, was levied on 960 acres of land in common and undivided, in township numbered three, within thirty days, and the levy was recorded within three months. Samuel G. Oakes by his deed of release conveyed all his interest in the lands levied upon to the tenant on June 4, 1845.

Assuming that the title to the lands reserved for public uses was legally conveyed to Cyrus Moore, if those lands were afterwards legally located, he could no longer have any title to an undivided portion or interest in that township. His title would follow and remain attached to the lands as severed and located in lots. When a person is the owner of an undivided

portion of lands, holden in common, which portion is severed and set out to be holden in severalty by a legal process and proceedings, his title adheres to and follows the estate and becomes limited by it.   *Cook* v. *Davenport,* 17 Mass. R. 345 ; *Arms* v. *Lyman,* 5 Pick. 210.

The lands appear to have been located on the application of the assessors of the plantation in the manner prescribed by law. The fact, that they had been sold and conveyed could not prevent their legal location.   No title could be conveyed, which would deprive the State of its right to cause the lands reserved to be located.   This right it had not surrendered.   The grantee could only acquire the title subject to it.   He could not insist upon their remaining in common and unlocated.   The State by the act incorporating the town of Argyle had sanctioned the location of the lots.

The attachment made of Moore's estate created a lien upon it, which, like a lien by judgment, followed the title and became a lien on the lots located.   *Bavington* v. *Clarke,* 2 Penn. 115.

The levy was not made upon the lots located, but upon an undivided portion of township numbered three.   Moore before that time had ceased to be the owner of any undivided interest in that township, and the levy could convey no such title to Oakes.   The levy to convey Moore's title should have been made upon the lots located for public uses.

When a creditor attaches the estate of his debtor held in common with others, that cannot prevent the other part owners from procuring a legal partition of the estate.   Nor will such partition vacate or destroy the attachment, which will remain as a lien on that part of it set off to the debtor.   And if the attachment be followed by a judgment, execution and levy ; that levy cannot be legally made upon the debtor's estate, as a common and undivided estate, in disregard of the rights of others legally acquired.   To be effectual to convey the title, it must be made upon the estate assigned to the debtor to be held in severalty.

So in this case by the location of the lands reserved for public

uses, all the owners of other lots and lands in the township became entitled to hold them not in common, subject to have them taken or diminished by a future division and assignment of the public lots. This right to hold their lots could not be affected by any attachment or levy made upon the reserved lands. The levy made by virtue of the execution, Oakes against Moore, being void, the tenant fails to have obtained any title under Moore.

The demandants however can only recover upon the strength of their own title. Danforth, the treasurer of the trustees, was not authorized by their vote to convey the lands to Moore without receiving his note with surety instead of the note of Winslow and Cony with Stevens. He made the conveyance to Moore without authority. It is contended, as he was authorized to convey to Winslow and Cony, that a conveyance to Moore would be good under that authority; and the case of *Williston* v. *Morse,* 10 Metc. 17, is cited to sustain the position. The cases are not similar. In that case the conveyance was made to another than the best bidder by his consent. The owners of the estate could not be injured by it. In this case the consideration of the note of Winslow and Cony with Stevens was the conveyance of the lands to them. A conveyance of the lands to Moore, without their consent, would deprive them of that consideration and the note would be of no value. No inference is authorized by the facts proved, that they assented without a surrender of their note. Such a conveyance by the treasurer, made without having any security, which could be legally enforced, would not be authorized.

The subsequent proceedings of the two boards of trustees might be sufficient to ratify that sale, if they could legally act in that manner. As their power was conferred by statute, it could be legally executed only in accordance with its provisions. Their acts, performed in a manner not authorized, would be inoperative. *Tenant defaulted.*